(67 Misc. Rep. 490.)

PEOPLE ex rel. QUEENS COUNTY WATER CO. v. WOODBURY et al., State Board of Tax Com'rs.

(Supreme Court, Special Term, Queens County. May 20, 1910.)

1. TAXATION (§ 376*)—VALUATION—"NET EARNINGS RULE."

The "net earnings rule" is a method of determining the value of a special franchise by ascertaining its earning capacity; the franchises being assumed to be worth that sum which, if placed at interest at a determined rate, will produce the amount which the franchise earns.

[Ed. Note.—For other cases, see Taxation, Cent. Dig. §§ 625, 629, 631; Dec. Dig. § 376.*]

2. TAXATION (§ 376*)—SPECIAL FRANCHISES—VALUATION—BASIS.

In determining the taxable value of a waterworks franchise, losses due to functional as well as physical depreciation should be charged as an expense of operation.

[Ed. Note.—For other cases, see Taxation, Cent. Dig. §§ 625, 629–631; Dec. Dig. § 376.*]

3. TAXATION (§ 496*)—ASSESSMENT—SPECIAL FRANCHISES—OVERVALUATION—BURDEN OF PROOF.

On review of the assessment of a special franchise, the burden is on the holder to show overvaluation, and if the overvaluation arises under

the net earnings rule he must establish the factors necessary to apply that rule.

[Ed. Note.—For other cases, see Taxation, Cent. Dig. § 906; Dec. Dig. § 496.*]

4. TAXATION (§ 376*)—WATERWORKS FRANCHISES—ASSESSMENT—BASIS.
In determining the taxable value of a waterworks franchise, earnings in an adjoining borough from the sale of about one-half of the company's output are properly included.

[Ed. Note.—For other cases, see Taxation, Cent. Dig. §§ 625, 629–631; Dec. Dig. § 376.*]

5. TAXATION (§ 376*)—WATERWORKS FRANCHISES—VALUATION—BASIS.
In determining the taxable value of a waterworks franchise, a gross sum, covering uncollectible accounts, less than 1 per cent. of the gross earnings, was properly deducted.

[Ed. Note.—For other cases, see Taxation, Cent. Dig. §§ 625, 629–631; Dec. Dig. § 376.*]

6. TAXATION (§ 376*)—WATERWORKS FRANCHISES—VALUATION—BASIS.
In determining the taxable value of a waterworks franchise, an item for farming expenses should not be deducted as a cost of operation.

[Ed. Note.—For other cases, see Taxation, Cent. Dig. §§ 625, 629–631; Dec. Dig. § 376.*]

7. TAXATION (§ 376*)—WATERWORKS FRANCHISES—VALUATION—EVIDENCE.
As affecting the taxable value of a waterworks franchise, the amount of land necessary for proper operation and for preservation of the water supply is largely a question for determination by the directors; but land purchased to prevent its acquisition by some one else should not be included.

[Ed. Note.—For other cases, see Taxation, Cent. Dig. §§ 625, 629–631; Dec. Dig. § 376.*]

8. TAXATION (§ 376*)—WATERWORKS FRANCHISES—VALUATION—BASIS.
One of the factors of the net earnings rule governing the taxable value of a waterworks franchise is the amount of capital invested in land.

[Ed. Note.—For other cases, see Taxation, Cent. Dig. §§ 625, 629–631; Dec. Dig. § 376.*]

9. TAXATION (§ 376*)—SPECIAL FRANCHISES—VALUATION.
As affecting the taxable value of a special franchise, its real value depends, not upon what it earns, but upon what it can earn by proper management.

[Ed. Note.—For other cases, see Taxation, Cent. Dig. §§ 625, 629–631; Dec. Dig. § 376.*]

10. TAXATION (§ 376*)—INTANGIBLE RIGHTS—VALUATION.
That the value of the tangible property of a waterworks company equals or exceeds the selling value of its stock and bonds is evidence tending to show that the intangible property has no value, and it is immaterial whether the company's property be necessary or convenient for its business or not.

[Ed. Note.—For other cases, see Taxation, Dec. Dig. § 376.*]

11. TAXATION (§ 496*)—SPECIAL FRANCHISES—OVERVALUATION—EVIDENCE—WEIGHT.
Evidence held to show that a waterworks franchise was not overvalued for taxation.

[Ed. Note.—For other cases, see Taxation, Dec. Dig. § 496.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

12. TAXATION (§ 496*)—SPECIAL FRANCHISES—ASSESSMENT—EQUALITY—EVI-
DENCE—WEIGHT.
Evidence *held* to show inequality in the assessment of a waterworks
franchise.
[Ed. Note.—For other cases, see Taxation, Cent. Dig. § 906; Dec. Dig.
§ 496.*]

Certiorari by the People of the State of New York, on the relation
of the Queens County Water Company, against Egbert E. Woodbury
and others, as members of the State Board of Tax Commissioners, the
City of New York intervening, to review an assessment of relator's
special franchise. Judgment rendered.

Lord, Day & Lord (Henry De Forest Baldwin and Frank B. Lord,
Jr., of counsel), for relator.

Edward R. O'Malley, Atty. Gen. (John Hill Morgan, of counsel), for
defendants.

Archibald R. Watson, Corp. Counsel (Addison B. Scoville and Curtis
A. Peters, of counsel), for city of New York.

BLACKMAR, J. This is a proceeding to review the action of the
state board of tax commissioners in assessing the special franchise of
the Queens County Water Company in the borough of Queens at the
sum of $275,000. The assessment is attacked on the grounds of over-
valuation and of inequality. The proceeding was brought on for trial
at Special Term upon the petition and return, and both the relator and
the defendants offered evidence upon the issues so joined. The return
does not disclose the rule or method made use of by the commissioners
in reaching their conclusion, and the issue of overvaluation is there-
fore one of fact as to the value of the special franchise, to be deter-
mined on the evidence presented.

The relator, while properly admitting in its elaborate brief that there
is no method which must be exclusively used by the court in determin-
ing the value, has presented an argument based on the application of
the so-called "net earnings rule." It claims that the application of this
rule shows that the intangible right had no value whatever, and that
therefore the value of the special franchise did not exceed the sum of
$128,779.73, which was the value of the pipes and mains in the streets
of Queens county. The city of New York, intervening, has filed a
brief, claiming that the net earnings rule, "if properly and justly ap-
plied," shows that the value of the special franchise in Queens county,
including the tangible property in the streets, is upwards of $800,000.
The Attorney General claims that the net earnings rule is inapplicable,
and is not a safe guide, or any guide at all, in determining the value of
the special franchise, and that, as no other means of determination is
presented to the court, the proceeding must be dismissed, because the
relator has failed in overthrowing the presumption that the assessment
is correct.

The net earnings rule is a method of determining the value of a spe-
cial franchise by ascertaining its earning capacity. It is assumed to be
worth that sum which, placed at interest at a determined rate, usually
6 or 7 per cent., will produce the amount which the franchise earns.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes.

If the gross earnings of the company, the operating expenses, other proper charges against earnings, and the value of the tangible property be given, the value of the special franchise is the result of a purely mathematical computation. The net earnings rule, as formulated by the Court of Appeals in the Jamaica Water Supply Company Case, 196 N. Y. 39, 89 N. E. 581, is as follows:

"(1) Ascertain the gross earnings. (2) Deduct the operating expenses. (3) Deduct a fair and reasonable return on that portion of the capital of the corporation which is invested in tangible property. (4) The resulting balance gives the earnings attributable to the special franchise. If the balance be capitalized at a fair rate, we have the value of the special franchise."

Both the relator and the city agree on the first factor, although the agreement is in appearance only. They differ in the items going to make up the second factor, and also as to the amount of the tangible property of the company, which is the basis of the third factor.

1. The relator claims that there should be deducted from the gross earnings the sum of $34,843.05 as depreciation of "depreciable property" for the year under consideration, while the city allows but $11,494.88. The relator's evidence on this subject consists of estimates made by its engineer for a number of years, showing an annual depreciation in the plant of 5⅞ per cent. The city's evidence consists of an elaborate table, in which the physical depreciation is figured out with respect to the life of the different items of relator's depreciable property. The difference in the result is principally due to the inclusion by the relator of functional depreciation or obsolesence, whereas the evidence of the city is confined to physical depreciation only. So long as depreciation of property is a proper factor to take into account in determining the net earnings, I cannot see why the rule should not be applied as well to functional as to physical depreciation. In both cases the property becomes valueless, because no longer capable of being applied to the purposes for which it was designed. It would be a false system of accounting which did not take into consideration the destruction of the value of property, from whatever cause, so long as that cause is in constant operation and can be foreseen with reasonable certainty. A loss due to functional depreciation is incurred in the operation of the business, and therefore should be charged as an expense of operation. City of Knoxville v. Knoxville Water Company, 212 U. S. 1, 29 Sup. Ct. 148, 53 L. Ed. 371. Machinery which to-day is sufficient for its purpose may become scrap iron through the development of inventions, and so pipes and mains sufficient for a system of water supply as it now exists may become valueless through changes in the conditions under which it is used. Because an iron pipe will lie 50 years in the ground without disintegration, it does not follow that the pipe will be of value to the company for 50 years. The conclusion reached as the result of actual experience seems to me more reliable. I am therefore inclined to approve the estimate of the relator as to the depreciation, in preference to that of the city.

2. Whether the rentals from the street hydrants repudiated by the city should be deducted from the gross earnings cannot be determined, without knowing whether the city is liable therefor. It is evident that the relator does not wish a determination that the city is not liable;

neither does the city desire a determination that it is; so neither party has presented evidence on the question. The relator has the burden of showing that the franchise was overvalued by the commissioners, and its contention as to this item, being unsupported by evidence, cannot be sustained.

3. I think that the relator is wrong in deducting from its gross earnings the net amount earned by the Brooklyn contract. It is true that the water pumped into the mains for delivery to the borough of Brooklyn does not go through the pipes laid in the streets; but it is a source of revenue from the invested capital. It is earnings from the sale of about one-half of the output of water obtained by the use of the land, the pumps, and the plant; and as these items of property must be allowed to produce a return to be deducted from the net earnings before determining the balance attributable to the special franchise, I think that the earnings from this source must be included in the computation.

4. The item of $1,000 claimed by the relator for uncollectible accounts, being less than 1 per cent., I think reasonable. On the other hand, I fail to see how the item of $1,800 for farming expenses can be called expenses of operating a plant for the distribution of water. The net earnings may be stated as follows:

| | | |
|---|---|---|
| Gross earnings.......................................... | | $180,790 45 |
| Operating expenses.................................. | $50,838 68 | |
| Taxes paid......................................... | 7,826 98 | |
| Depreciation ...................................... | 34,835 05 | |
| Uncollectible accounts............................. | 1,000 00 | |
| | | 94,500 71 |
| Net earnings......................................... | | $ 86,289 74 |

The amount of the capital of the company invested in tangible property must next be ascertained. There is no serious dispute over the items, other than land, a list of which may be stated as follows:

| | |
|---|---|
| Pipes in public streets—Queens.................................. | $128,779 73 |
| Pipes in public streets—Nassau.................................. | 155,167 34 |
| Pipes in private streets—Queens............................... | 37,444 45 |
| Pipes in private streets—Nassau............................... | 12,386 43 |
| Personal property............................................. | 72,862 02 |
| Improvements in Nassau county................................ | 228,038 23 |
| Accounts receivable and cash.................................. | 125,439 34 |
| Total (omitting land)................................... | $760,117 54 |

Six per cent. upon the amount of this tangible property amounts to $45,607.05. Deducting this from the amount of the net earnings leaves a balance of $40,682.69, with which to pay a return on the land before ascertaining the amount of the net earnings attributable to the special franchise. In order to apply the net earnings rule, or before it can be determined whether that rule should be adopted, it becomes necessary to know the amount of the capital invested in land. This brings us to the point most seriously contested by the parties.

5. The relator claims that it possesses, as part of its tangible property invested in its business, 846 acres of land, which, with it holdings at Far Rockaway and Arverne, have a present value of $1,500,000. The contention of the city is that the land actually and necessarily used in

the conduct of its business does not exceed 50 acres in Valley Stream, of the value of $20,000, and land in Queens and Arverne of the value of $45,000, or $65,000 in all. If the relator is right in claiming that it is entitled to 6 per cent. upon land of the value of $1,500,000, to be deducted from the net earnings, before capitalizing them to find the value of its intangible franchise rights, then it follows that, no matter how the net earnings are computed, there is nothing left for capitalization, and, if this question is to be solved upon the application of the net earnings rule, the intangible rights were worth nothing. On the other hand, if the city is right in claiming that this land is not necessary for the purposes of relator's business, and is carried practically as a real estate speculation, and that the amount of land necessary for its business should not be valued at more than $65,000, then apparently the application of the net earnings rule would justify an assessment greater than the one actually imposed. This question, therefore, must be examined. I shall pass over the land at Far Rockaway and Arverne, for the highest value claimed for it, with the improvements, by the relator, is $57,000, while the city conceded a value of $45,000. This difference is not of enough importance to demand the attention of the court.

In 1898 the company purchased 330 acres in Valley Stream, with a plant in operation, giving therefor $300,000 in its stock and bonds. It operated with this land and plant until 1901, when it began to purchase land, and during the next eight years it increased its holdings to 846 acres, paying for such additional land about $224,000. It is claimed by the relator that this large holding was necessary to protect its water supply, to secure the streams between which its plant is situated from contamination, to prevent the establishment of other waterworks to the north, thereby interrupting the natural flow of water to its wells, to enable it to establish pumping stations in the future as necessity therefor may arise, and to prevent invasion by the city of New York. The city claims that not more than 50 acres of land is necessary for the preservation of the water supply; that the purchase of land extends over and beyond the cone of depression of the water table formed by the operation of its wells; that the protection of the streams from contamination is not necessary, because the water is not taken directly from the streams, but from driven wells, after it has percolated through the soil and has been purified by natural filtration; and that land purchased for the purpose of preventing the possible operation of another water company in the neighborhood is not necessary for the conduct of its present business.

This contest illustrates the difficulty of the application of the net earnings rule. How much land is necessary for the proper operation of the water company and for the preservation of the water supply is largely a question which in the nature of things must be determined by the judgment of the directors of the company. At the best it is a matter resting in opinion merely. If the land is rapidly advancing in value, the probability is that the directors would favor more liberal purchases. There is a difference of opinion as to the source of the water supply of Long Island, and as to the necessity of extensive land holdings to protect the supply. There is a difference of opinion as to the

necessity of owning land upon the banks of the streams in order to perfect the purity of the water supply. I do not see how the purchase of land to prevent its acquisition by some one else, and not for the purpose of securing water, can be said to be necessary for the purpose of securing and distributing the supply of water. There is nothing in the evidence enabling me to determine how much of this land was purchased for the purpose of protecting the present flow from the wells, how much for the protection of the streams from contamination, how much for the purposes of future extension, if the growth of the business should warrant, and how much for the purpose of preventing its acquisition by the city of New York or other parties.

I cannot acquiesce in the claim of the relator that any part of this land was necessary to protect it from what it calls "invasion" by the city of New York. Much is said about the cases of Queens County Water Company v. Monroe, 83 App. Div. 105, 82 N. Y. Supp. 610, and Queens County Water Company v. O'Brien, 131 App. Div. 91, 115 N. Y. Supp. 495, as illustrating the value of this land in limiting the extension of the water system of the city of New York. But these cases were taxpayers' actions only. The ownership of this particular land did not influence the decisions. A taxpayer owning land in the borough of the Bronx or on Staten Island would have had the same standing to secure the injunction.

Moreover, I am at a loss for evidence satisfactory to me to determine what is the present value of this land. According to the relator's testimony, its real property cost $584,934.09. This includes $300,000 in stock and bonds paid for the Dubois purchase of about 300 acres, with a plant, $224,000 paid for land in Valley Stream since 1901, and the cost of the Far Rockaway and Arverne property. The application made to the department of taxes and assessments of the city of New York for the revision of its assessment states that the value of the real property of the relator, including the improvements, now valued at $228,038.23, as of the second Monday of January, 1907, was $545,933.-70, and about 15 acres have been since purchased. The expert, upon whose testimony the relator relies to convince the court that the present value of the land is $1,500,000, states that the increase in value from 1907 to 1909 was about 10 per cent. Both of these valuations were made by the relator as representations to public authorities to induce a downward revision of its taxes, and I know of no reason why I should accept one scale of valuations as any more reliable than the other. I am therefore without satisfactory evidence which enables me to determine the value of the land owned by the relator.

The issue raised by the allegations in the petition and the denials in the return is one of fact. Was the franchise overvalued? This is to be determined by the evidence presented on the trial. I am not concerned either with the figures presented to the board in the report of the corporation or in the petition for the correction of the assessment. I am not reviewing the action of the commissioners upon evidence submitted to them. I am trying an issue of fact on the evidence submitted to me. Upon this issue the relator has the burden of proof. The relator must show by a preponderance of evidence that the franchise was overvalued. If this is to be done by the application of the net earn-

ings rule, the relator must establish the factors necessary to be used in applying the rule. Among these factors is the amount of the capital invested in land. But I am unable to tell from the evidence how much of the land owned by the relator is reasonably necessary for the present purposes of the company in supplying water, and what the value of the land is. In this respect the relator has failed to carry the burden of proof. I cannot, therefore, determine the value of this special franchise by the use of the net earnings rule.

The more the net earnings rule is examined, the more apparent becomes the wisdom of our appellate tribunals in holding that it does not furnish a method which is necessarily controlling in determining the value of a special franchise. It is obvious that the application of this rule reduces the value of the special franchise by the amount of every increase in the tangible property used in the business. 'If, therefore, the earnings of the company should be largely increased and the purchase of land should be continued, such earnings would not result in a proportionately increased value of the special franchise. In 1901 the company was operating with a holding of 330 acres. Since that time it has purchased over 500 acres, at a cost of upwards of $200,000. The strict application of the net earnings rule would reduce the value of the special franchise by the amount of every dollar expended in the purchase of land. If the land increased in value $500,000, the value of the special franchise would decrease just that amount. If the officers serve without pay, as they do in this case, the value of the special franchise is increased by a capitalization of a fair salary list to the officers of 6 per cent. If the value of the land should depreciate, the special franchise would appreciate proportionately in amount. This company has claims against the city of upwards of $7,000 for the rental of hydrants. If this claim be valid, the special franchise is worth about $120,000 more than if the claim is invalid. These illustrations indicate that the net earnings rule is rather an aid to the ascertainment of the value of the special franchise than a method by which such value can be determined by arithmetical computation.

Undoubtedly the most important element in determining the value of a special franchise is the earning capacity of the company; but no thoughtful appraiser would consider the face showings of the statement of the results of the business for a single year as conclusive without a consideration of many other matters. The real value of a special franchise depends, not upon what it does earn, but upon what it can be made to earn by proper management and the application of proper financial methods. Suppose any one were contemplating the purchase of the Queens County Water Company, what course would he take? He would make a careful investigation of its methods of management; an appraisal of its plant, machinery, and pipes, with regard to their physical condition and adaptability for use; a determination whether the land owned by the company was acquired with reasonable regard for the necessary requirements of the business; an appraisal of the different parcels of real property; an investigation of the accounts of the company over a number of years to determine its earning power, as distinguished from the earnings which it may chance to make in a single year. He would also try to form an opinion of the future pros-

pects of the company, having in mind that a diminution of its earning capacity below a certain amount would not only wipe out the value of its special franchise, but also of all the property devoted to and used in such special franchise and available for no other purpose. With all these and probably other elements in mind, an intelligent estimate could be made of the value of all the property of the company including its special franchise. To require such a scientific and exhaustive analysis to be presented to the court in a proceeding of this kind would practically nullify the rights of the owners to review the action of the commissioners, and for that reason the net earnings rule may often be applied to reach a result sufficiently accurate for practical purposes; but, in order to induce the court to adopt the rule, the different elements necessarily used in its application must be shown with reasonable certainty by competent evidence.

But the rejection of the net earnings rule is not decisive of the case. It remains to inquire whether there is other evidence which, taken in connection with that already considered, leads to the conclusion that the franchise was overvalued. The issued capital stock of the company is $1,050,000, and its bonded indebtedness $500,000. Four and one-half per cent. dividends were paid on the stock last year, and interest at 5 per cent. on the bonds. The bonds are presumably worth par, and the stock has never sold above par; the last sale of which we have knowledge being at 80 cents on the dollar. As the capital stock and bonds represent all the property of the company, both tangible and intangible, its selling value is some evidence of the value of all the company's property. If it should appear that the value of the tangible property is equal to or greater than the selling value of all its stock and bonds, this would furnish some evidence that the intangible property has no value. In considering this evidence it makes no difference whether the property of the company is necessary, or even convenient, for its business or not. If the land of this company is worth $800,000, then its tangible property would sum up to the par value of its share and bond capital. But, in view of the uncertainty of the valuation of the land, the fact that there does not seem to be any real market for the stock, where its value may be tested by sales freely made, and other evidence to be adverted to, I am not inclined to give any controlling consideration to this bit of evidence.

All the property of the company used in the transaction of its business produced and sold a certain amount of water. About one-half of its output was sold to the city of Brooklyn for the sum of $32,377.16. The remaining half, marketed by means of its special franchise, produced $142,123.10. The pipes in the public and private streets through which this half was conveyed to its customers are worth $333,777.15. The amount sold in Queens by the use of the special franchise was $106,272.09. The value of pipes in public and private streets in Queens was $166,224.18. It seems obvious from these figures that the special franchise in Queens has a very substantial value. The company has no legal monopoly; but it has a practical monopoly. It supplies water to a territory rapidly growing in population. The income from the sale of water and from hydrant rentals, after deducting operating expenses, has increased from $21,877.94 in 1898 to $130,918.18 in 1908, and

about 75 per cent. of its income from the sale of water to customers other than the city of Brooklyn has been earned in the county of Queens by the use of the special franchise in question. I have given to all this evidence such careful and thoughtful consideration as I am able to bring to bear upon it, and I remain unconvinced that the commissioners have overvalued this franchise.

The only remaining question is that of inequality. The same evidence of inequality was introduced in this case as in the case of People ex rel. Queens Borough Gas & Electric Company v. Woodbury (recently decided by me) 123 N. Y. Supp. 592. I have considered this question in the determination of that case, and I there decided that the presumption was that the assessment was made at the full value of the special franchise, and that, for the purpose of determining the question of inequality, comparison must be made with the assessment of other property in the borough of Queens; that it appeared that property in the borough of Queens was not assessed at its full value; that the evidence of the assessment of other property introduced by the relator was confined to the Fifth ward of the said borough; that I could not find, without further evidence, that the ratio between the assessed value and the actual value obtaining in the Fifth ward prevailed throughout the county at large; that the only evidence of the relation between the assessed and the real value as to the county at large was the determination of the state board of equalization to the effect that property in the borough of Queens was assessed at 87 per cent.; that such determination was treated by both parties as competent evidence upon the issue; and that, therefore, I should hold that the special franchise was assessed at its full value, but that property generally in the county of Queens was assessed at 87 per cent. of its value. It has since been suggested that I was in error in stating in the opinion in that case that the determination of the state board of equalization was that property was assessed at 87 per cent. of the equalized value of all the assessed property in the state of New York, but that the determination of the state board was that property in the borough of Queens was assessed at 87 per cent. of its actual value. The evidence upon this point seemed to me to be indefinite, and it is possible that I was in error in this respect. Such error, however, if it did exist, could not change the result which I reached; and if the determination of the state board of equalization was that the assessed value in the borough of Queens was 87 per cent. of its actual value, and not 87 per cent. of the equalized value of the assessments through the state of New York, it furnishes an additional reason for my decision.

I therefore decide in this case that 13 per cent. should be deducted from the sum of $275,000, and that the assessment of the relator's property should be fixed at the sum of $239,250. Costs must be awarded against the relator.