THE PEOPLE OF THE STATE OF NEW YORK ex rel. MEXICAN TELEGRAPH COMPANY, Appellant, *v.* STATE TAX COMMISSION, Respondent, and THE CITY OF NEW YORK, Intervenor, Respondent. (Taxes of 1921.)

THE PEOPLE OF THE STATE OF NEW YORK ex rel. MEXICAN TELEGRAPH COMPANY, Appellant, *v.* STATE TAX COMMISSION, Respondent, and THE CITY OF NEW YORK, Intervenor, Respondent. (Taxes of 1922.)

First Department, February 4, 1927.

**Taxation — special franchise tax — relator owns cable running from hut at Coney Island to Colon — certiorari to review special franchise tax assessed on cable between low-water mark and three-mile limit, together with special franchise right to construct, maintain and operate same — relator has not shown overvaluation — it was proper to make allowance for terminal value in apportioning intangible value — not error to assume that twenty-five per cent of gross revenue originating in New York city was due to terminal value — evidence shows higher percentage — proper deduction made for twenty-three miles of leased land wires — relator not entitled to have exemption because of fact that it held Federal license to land cable.**

The relator owns and operates a cable line running from a hut at Coney Island to Colon. In certiorari proceedings to review the special franchise tax assessed on cables between the low-water mark at Coney Island and the three-mile limit, together with the State special franchise right to construct, maintain and operate the same, the contention by the relator that the assessment was excessive is not sustained by the evidence.

26

It was not error for the State Tax Commission arbitrarily to assume that twenty-five per cent of the gross revenue originating in New York city over the Colon cables was due to a terminal value, for as a matter of fact, the relator's own evidence tended to show that the percentage was thirty-nine, instead of twenty-five.

In apportioning the intangible value on the basis of the net earnings rule, it was proper for the State Tax Commission to make an allowance for terminal value. The relator was not unjustly treated in that the whole terminal value was assigned to the cable running from the hut on Coney Island to the three-mile limit, and that consideration was not given to twenty-three miles of leased wires running from the hut to relator's city office, for it appears that in estimating the intangible value the State Tax Commission credited the relator with the rentals paid for the land wires.

The Appellate Division lays down no fixed rule for the assessment of the special franchise, nor does it hold that the Commission has undervalued it, but merely that the special franchise was not on the record overvalued.

The State Tax Commission was not required to take into consideration a Federal license issued to the relator granting it permission to land cables at Coney Island for even though the relator could not land its cable without a Federal license, still it was possessed of a special franchise from the State which is subject to taxation.

APPEAL in the above-entitled proceedings by the Mexican Telegraph Company from orders of the Supreme Court, made at the New York Special Term and entered in the office of the clerk of the county of New York on the 11th day of June, 1925, confirming assessments against the relator's alleged special franchise in the borough of Brooklyn, city of New York, for the years 1921 and 1922, and dismissing a writ of certiorari in each proceeding.

*Edwin De T. Bechtel* of counsel [*Rush Taggart* with him on the brief; *Carter, Ledyard & Milburn*, attorneys], for the appellant.

*William H. King* of counsel [*Joseph A. Dodin* with him on the brief; *George P. Nicholson, Corporation Counsel*], for the intervenor, respondent.

*Robert S. Conklin* of counsel [*Albert Ottinger, Attorney-General*], for the defendant, respondent.

PROSKAUER, J. The relator owns and operates a cable line running from a hut at Coney Island to Colon.

These are certiorari proceedings to review the special franchise tax assessed on the cables between the low-water mark at Coney Island and the three-mile limit, together with the State special franchise right to construct, maintain and operate the same. The unequalized assessment for the year 1921 was fixed at $400,000 and for the year 1922 at $500,000.

The assessments are claimed to be excessive. That the method of assessment used by the Commission was not scientifically exact

is conceded. However, " the theory upon which the assessment is made is of no importance. The only question to be examined in a case like this is whether the relator can be said to be aggrieved because the amount of the assessment is too large." (*People ex rel. U. V. Copper Co.* v. *Feitner*, 54 App. Div. 217; affd., 165 N. Y. 645; *People ex rel. Straus* v. *Purdy*, 160 App. Div. 871; affd., 212 N. Y. 554; *People ex rel. Queens County Water Co.* v. *Woodbury*, 67 Misc. 490; affd., 143 App. Div. 618; 202 N. Y. 619.)

The relator has not only failed to sustain the burden of showing overvaluation, but has given no evidence thereof. It offered nothing but record facts unrelated to valuation and the proceedings before the Tax Commission, together with some of the documents upon which the Commission acted. The Commission's method does not, on its face, show overvaluation. By the net earnings rule it estimated that for each dollar of revenue there was $5.53 of intangible capital value for 1921 and $4.72 for 1922. It assumed arbitrarily that twenty-five per cent of the gross revenue originating in New York city over the Colon cables was due to a terminal value; estimated this twenty-five per cent at approximately $98,000 for 1921 and $140,000 for 1922 and capitalized this income for the respective years on the basis of the figures of $5.53 for 1921 and $4.72 for 1922. To the resultant figures it added first the tangible value of the submarine cables within the three-mile limit and second a valuation of the intangible value of the wire mileage within the three-mile limit calculated by taking that proportion of seventy-five per cent of the entire intangible value which the wire mileage within the three-mile limit bore to the entire mileage. This computation showed basis for an assessment for 1921 of over $580,000 and for 1922 of over $740,000 as against the unequalized assessments respectively of $400,000 and $500,000.

There are other figures in the record introduced by the respondent, however, which give a more accurate basis for audit and confirm the conservatism of the assessments. The relator in addition to its Colon cables operated other telegraph lines having no direct connection with these cables or with the city of New York. The Commission did not have what the record here discloses — the segregated income of the Colon cables. Applying the net earnings rule to these segregated earnings, the total intangible value for the year 1921 is $7,264,374, and for 1922 is $7,535,886. Substituting these actual figures for the estimated corresponding figures used by the State Tax Commission, and using its method, the resultant assessment would be over $670,000 for 1921 and over $740,000 for 1922.

Relator urges, however, that in apportioning this intangible value

it is not proper to make an allowance for terminal value. In *People ex rel. New York Cent. & H. R. R. R. Co.* v. *Priest* (206 N. Y. 274, 300) Chase, J., writes: " Any comparison of track or passenger mileage necessarily spreads the earnings over the mileage, without taking into account the value of a franchise at a particular place to increase the earnings of the system of road with which it is connected. A particular franchise is frequently of important value in connection with a railroad system as a means of obtaining and retaining business."

There may be a difference in degree, to be borne in mind in making computations, between the terminal value of a railroad line and that of cable lines, which can be more readily duplicated, but it does not follow that there is no terminal value in a cable system.

In *People ex rel. Commercial Cable Co.* v. *Tax Commissioners* (99 Misc. 532, 538), dealing with the special franchise of a telegraph system, Pendleton, J., writes: " Where the mileage of the telegraph lines, within the city, is small as compared with the total mileage, but the terminal property in the city is the means of reaching the central point from which business emanates and to which it converges, a comparison of the mileage of the special franchise with the total mileage cannot in the nature of things be an accurate basis for determining what proportion of the total net earnings should be allocated to the terminal property."

And the converse of this proposition which fortifies the conclusion is thus stated by Holmes, J., in *Fargo* v. *Hart* (193 U. S. 490, 499): " It is obvious however that this notion of organic unity may be made a means of unlawfully taxing the privilege, or property outside the State, under the name of enhanced value or good will, if it is not closely confined to its true meaning. So long as it fairly may be assumed that the different parts of a line are about equal in value a division by mileage is justifiable. But it is recognized in the cases that if for instance a railroad company had terminals in one State equal in value to all the rest of the line through another, the latter State could not make use of the unity of the road to equalize the value of every mile."

The relator next claims that the arbitrary use of twenty-five per cent as the factor in fixing terminal value was excessive. Before the Commission it urged (in Exhibit 6) that this factor should be reduced to nineteen and ninety-one one-hundredths per cent. The only evidence in the record on this subject is that in 1919 the number of words sent north-bound over the Colon cables was approximately 7,800,000; the number of words filed at the Broad street office of the relator, which was connected with leased

wires directly with the terminal at Coney Island, was approximately 7,459,000; and the south-bound wordage received through other sources was approximately 3,500,000. Similar figures for later years are not given. Nothing is suggested in the record, however, that this year was not a fairly typical one. Computation shows then that approximately thirty-nine per cent of the company's wordage is filed at the Broad street office, which connects directly with the Coney Island hut.

Before the Tax Commission the relator stated in Exhibit 6 that the figure of nineteen and ninety-one one-hundredths per cent was shown by its records " for the percentage of revenue due to traffic originating in New York City and bound south over these cables." The only figures in the record show that this percentage was actually thirty-nine per cent, even after the elimination of the three and a half million south-bound words not directly sent through the Broad street office. This percentage is computed with the assignment of no good will to the terminal by reason of any north-bound business coming to it nor by reason of this large south-bound wordage not fi ed at the Broad street office. The position taken by the relator before the Commission impliedly recognized this percentage as a pertinent factor in determining terminal value, and it is in fact a pertinent and important factor. As proof shows probable justification of the use of thirty-nine per cent as a factor, we cannot find that the use of twenty-five per cent by the Commission was unfair to the relator.

The relator next urges that it has been unfairly treated, in that the whole terminal value was assigned to the fourteen and seventy-two one-hundredths miles of cable running from the Coney Island hut to the three-mile limit, whereas a portion of it should be assigned to the twenty-three miles of leased wires running from the Coney Island hut to the Broad street office. The relator here entirely loses sight of the fact that in estimating the intangible value the Commission credited to the relator the rental paid for these wires. It appears clearly from relator's Exhibit 4, paragraph 8, that the rental of the leased wires, approximately $8,300 a year (which entered into the item described as " Rent of Pole Lines," $18,946.63 for the year 1921 and $18,867.70 for 1922), was deducted as an operating expense in the computations. It is certainly deducted in the computation by which the total unequalized intangible value is estimated at the figures heretofore stated in this opinion. The relator, therefore, has already received credit for the entire sum it pays for these twenty-three miles of leased wire, deducted as an operating expense, and, therefore, fully taken into account in capitalizing the revenue under the net earnings rule. It is note-

worthy, however, that even if this allowance were made as the relator claims, the computation of the assessment on its own brief on the basis of the use of the factor of twenty-five per cent would still be nearly $300,000 for 1921 and $329,000 for 1922, and if the more accurate factor of thirty-nine per cent were substituted for the twenty-five per cent, the resultant computation would show an assessment substantially in excess of the one made by the Commission.

We intend to lay down no fixed rule for the assessment of this special franchise, nor to suggest that the Commission has undervalued it. The foregoing computations, however, demonstrate that in no view of the case can the assessments be characterized as actually excessive. As is stated by McREYNOLDS, J., in *Union Tank Line Co.* v. *Wright* (249 U. S. 275, 282) (referring to intangibles): " How to appraise them fairly when the tangibles constitute part of a going concern operating in many States often presents grave difficulties; and absolute accuracy is generally impossible." The essential is merely that the plan pursued be not arbitrary " and the consequent valuation grossly excessive."

These assessments are in fact fair.

We come now to consider the Federal questions involved. This company secured a permit from President Roosevelt in 1907 to land these cables. It has been held ( *United States* v. *Western Union Telegraph Co.*, 272 Fed. 311; affd., Id. 893) that prior to the passage of the Kellogg Act in 1921 the President had no power to grant or withhold such licenses and the appellant substantially concedes that in the present state of the law these Federal questions do not exist for this court with respect to the 1921 assessment.

With respect to the 1922 tax, however, in 1921 Congress passed the so-called Kellogg Act (42 U. S. Stat. at Large, 8, chap. 12), which provided in effect that no person should operate a submarine cable " unless a written license to land or operate such cable has been issued by the President of the United States " and that the President might withhold or revoke the license after hearing whenever he deemed it appropriate. (See United States Code, tit. 47, § 34 *et seq.*) The appellant did not procure any additional license after the passage of the Kellogg Act, claiming that the phrase " unless a written license * * * has been issued by the President of the United States " made their 1907 license from President Roosevelt sufficient to meet the requirements of the Kellogg Act. The extreme of its contention is that it now has only a Federal and no longer a State franchise; that it could maintain this cable under Federal authority without any grant from the State and, therefore that it is not subject to any franchise tax; and failing

this extreme, it urges that it should affirmatively appear that allowance has been made in fixing the value of the intangibles for the value of this Federal license.   Neither contention can be supported.

That this corporation derives its vitality in part from the Federal government does not exempt it from State taxation of any of its property, including such special franchises as it enjoys from the State.   As is stated by Mr. Justice STONE in *Metcalf* v. *Mitchell* (—— U. S. ——): " Not every person who uses his property or derives a profit, in his dealings with the government, may clothe himself with immunity from taxation on the theory that either he or his property is an instrumentality of government within the meaning of the rule."   He continues that the test must be applied in the light of the reason for the rule of exemption, which is thus stated: " Its origin was due to the essential requirement of our constitutional system that the Federal government must exercise its authority within the territorial limits of the States; and it rests on the conviction that each government in order that it may administer its affairs within its own sphere, must be left free from undue interference by the other."

In the application of this rule the Supreme Court of the United States has sustained taxation of intangible value by the State in cases wholly analogous with this.

In *Thomson* v. *Pacific Railroad* (76 U. S. [9 Wall.] 579) it was contended that the  Union Pacific railroad, being constructed under the direction and authority of Congress for the uses and purposes of the United States and being part of the system of roads thus constructed, was exempt from State  taxation; the court held it subject to such taxation, stating that it could not extend the rule of *McCulloch* v. *State of Maryland* (4 Wheat. 316) " to the case of a corporation deriving its existence from State law, exercising its franchise under State law and holding its property within State jurisdiction and under State protection."

In *Gromer* v. *Standard Dredging Co.* (224 U. S. 362) the dissenting opinion states: " We agree with the decision of the Court that the Territory of Porto Rico has jurisdiction for taxing purposes over the harbor and waters in question and that the use of the property for Government purposes does not exempt it from taxation."   To the same effect is *Fidelity & Deposit Co.* v. *Pennsylvania* (240 U. S. 319).

In *Choctaw, Oklahoma & Gulf R. R. Co.* v. *Mackey* (256 U. S. 531) it was similarly held that railroad property was taxable despite the fact that it was on land which had belonged to an Indian nation and was used by the company pursuant to Federal authority

408   People ex rel. Mexican Tel. Co. *v.* State Tax Comm.

First Department, February, 1927.          [Vol. 219

to build the railroad.   BRANDEIS, J., writes: " The mere fact that property is used, among others, by the United States as an instrument for effecting its purpose does not relieve it from State taxation."   (Citing *Western Union Telegraph Co.* v. *Massachusetts,* 125 U. S. 530, and *Central Pac. R. R. Co.* v. *California,* 162 id. 91.)

It is true that at least one early case holds (*California* v. *Central Pac. R. R. Co.,* 127 U. S. 1) and others state (*Railroad Co.* v. *Peniston,* 85 id. [18 Wall.] 5) that the Federal franchise itself may not be taxed, but the later cases have in fact allowed the taxation of the intangible value of the property viewed as a going concern, though sometimes this result is reached by a presumption that the assessment did not include the value of the " Federal franchise."   (*Central Pac. R. R. Co.* v. *California,* 162 U. S. 91; *People ex rel. Postal Telegraph-Cable Co.* v. *State Board of Tax Commissioners,* 224 N. Y. 167.)   There is factual distinction between a tax on the intangible value of property, viewed as part of a system, and a tax on the privilege of exercising corporate functions.   While a tax on the Federal privilege of exercising corporate functions may be void as an interference with a Federal instrumentality, a tax on its intangible property (included in the " special franchise ") cannot be condemned unless its effect will be unduly to interfere with an agency through which the " government immediately and directly exercises its sovereign powers."   (*Metcalf* v. *Mitchell,* — U. S. —.)   The relator does not become such an agency merely because the Federal government has seen fit to regulate by requirement of a license.

That this relator held a license from the Federal government is not inconsistent with the fact that it also enjoyed a taxable special franchise from the State.

In *People ex rel. Postal Telegraph-Cable Co.* v. *State Board of Tax Commissioners* (224 N. Y. 167) the Postal Telegraph-Cable Company had accepted the provisions of the United States statute of 1866 (14 U. S. Stat. at Large, 221, chap. 230; U. S. R. S. § 5263 *et seq.;* now United States Code, tit. 47, § 1 *et seq.*) which gave telegraph companies the right to occupy public roads; the company contended that its franchises were thus derived from the Federal act.   The court at Special Term (99 Misc. 523) had sustained the contention to the extent of holding that it was incumbent upon the State Tax Commission to show that it was separating the value of the Federal from the State franchise. HISCOCK, Ch. J., writing for the Court of Appeals, said (p. 177): " Where a telegraph company seeks to appropriate parts of streets or highways to an exclusive use under the terms of the act ' it is within the competency of the State, representing the sovereignty of that local public, to exact for its benefit compensation for this

exclusive occupation.' The act gives 'no right to use the soil of the streets, even though post roads, as against private owners or as against the city or State where it owns the land.'" And also (p. 176): "The franchises granted by the State would seem to be prior in point of time and  *  *  *  were not identical with, but broader than, those if any granted by Congress." And the case decides that, even if the act of 1866 were regarded as giving a Federal franchise, the State may none the less tax its own special franchises, and that the court will presume that no part of the assessment has been made against any Federal franchise.

The Federal authorities justify the conclusion that the act of 1866, which is even stronger in favor of telegraph companies than is the Kellogg Act in favor of this relator, did not operate at all to impair the power of the States to tax this intangible.

In *Western Union Telegraph Co.* v. *Gottlieb* (190 U. S. 412, 424) Mr. Justice MCKENNA thus states the effect of the decision in *Western Union Telegraph Co.* v. *Massachusetts* (125 U. S. 530): "That the company owed its existence as a corporation and its right to exercise the business of telegraphy to the laws of the State under which it was organized; that the privilege of running the lines of its wires over and along the military and post roads of the United States was granted by the act of Congress, but that the statute was merely permissive and conferred no exemption from the ordinary burdens of taxation; that the State could not by any specific statute prevent a corporation from placing its lines along the post roads or stop the use of them after they were so placed, but the corporation could be taxed in exchange for the protection it received from the State 'upon its real or personal property as any other person would be.'" And his conclusion is that "the State was not precluded from taxing the property because the State had not created the company or conferred franchise upon it, or because it derived rights or privileges under the act of July, 1866." And it was further held that the property of a telegraph company situate within a State "may be regarded not abstractedly or strictly locally, but as a part of a system operated in other States," and, therefore, its intangible value might be included in the assessment.

In *Western Union Telegraph Co.* v. *Richmond* (224 U. S. 160) the effect of the stronger act of 1866 was thus closely limited by Mr. Justice HOLMES: "The act of Congress of course conveyed no title and did not attempt to found one by delegating the power to take by eminent domain.  *  *  *  It made the erection of telegraph lines free to all submitting to its conditions, as against an attempt by a State to exclude them because they were foreign corporations, or because of its wish to erect a monopoly of its own.  *  *  *

It has been held to prevent a State from stopping the operation of lines within the act by injunction for failure to pay taxes.  *  *  * But except in this negative sense the statute is only permissive, not a source of positive rights." Commenting on this in *Williams* v. *Talladega* (226 U. S. 404, 416) Mr. Justice DAY writes: " These cases, taken together, establish the proposition that the privilege given under the terms of the act to use the military and post roads of the United States for the poles and wires of the company is to be regarded as permissive in character and not as creating corporate rights and privileges to carry on the business of telegraphy, which were derived from the laws of the State incorporating the company, and that this permissive grant did not prevent the State from taxing the real or personal property belonging to the company within its borders or from imposing a license tax upon the right to do a local business within the State."

The essential purport of these cases may be thus stated: The State owns the land under water (*Mulry* v. *Norton*, 100 N. Y. 424; *Matter of City of Buffalo*, 206 id. 319, 325); it has conferred a franchise upon the relator to maintain its cables over these lands; the Federal mandate under the Kellogg Act is that a State may not physically bar the Federal licensee; but despite this mandate, the Federal government has conferred no franchise, but merely a negative right and has not intended to interfere with the State's right to tax the licensee in exactly the same manner that it m'ght tax any other grantee of a State special franchise.

The orders appealed from should be affirmed, with ten dollars costs and disbursements.

DOWLING, P. J., MERRELL and MARTIN, JJ., concur.

Orders affirmed, with ten dollars costs and disbursements.